UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LELIA KELLEY and LINDA STEPHENS, ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> LARRY DAVIS, individually and in his official ) <br> capacity as Madison County Assessor and ) <br> MADISON COUNTY, ) <br> ) <br> Defendants. ) | 1:11-cv-331- SEB-DML |

**ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Docket No. 45)

This case arises out of Plaintiffs' employment in the Madison County Assessor's Office. It involves Plaintiffs' claims, brought under 42 U.S.C. § 1983, that after Republican Larry Davis was elected as Madison County Assessor, he terminated Plaintiffs from their long-held jobs because they were Democrats and had supported the unsuccessful Democrat incumbent. The case is now before us on Defendants' Motion for Summary Judgment. For the reasons set forth below, we GRANT Defendants' motion.[1]

**I. FACTS**

Plaintiff Linda Stephens, a registered Democrat, was hired by a Democrat and began working for Madison County, Indiana on June 1, 1980. Plaintiff Lelia Kelley, also a registered Democrat,

---

[1] As an interesting aside, we note that Larry Davis is no stranger to political retaliation cases. He was the plaintiff in a case filed in this Court in 2008 titled, Larry Davis v. Kris Ockomon, in his individual and official capacities ad the Mayor of the City of Anderson, et al., Cause No. 1:08-cv-270-WTL-TAB. In that case, Davis asserted that he had been the victim of political retaliation when he was terminated from a job with the Anderson Animal Control Center that he had held for nearly 20 years following the 2007 mayoral election. However, he did not succeed on those claims. In this case, he has fared better.

was hired by a Democrat and began working for Madison County, Indiana on September 19, 1994. Initially, both women worked in the Anderson Township Assessor's Office. Later, their jobs were transferred to Madison County Assessor's Office.

Over the nearly thirty years that Stephens was employed in the assessors' offices, her duties included assessing residential real property. Her job required her to travel to people's homes, take measurements, and calculate the property taxes due based on certain property tax assessment standards. Over the nearly sixteen years that Kelley was employed in the assessors' offices, her duties included assessing business personal property. Her job required her to review and audit taxpayer business personal property tax returns. Several of the elected office holders for whom Stephens and Kelley worked throughout the years found them to be highly proficient, even "outstanding" employees.

In 2010, Cheryl Heath, a Democrat, was the duly elected Madison County Assessor. Heath's term of office expired on December 31, 2010. Thus, the position of Madison County Assessor was up for election in November 2010, with the winner of the election to take office on January 1, 2011.

Heath desired to serve a second term of office and asked Stephens and Kelley to help her with her reelection campaign. Stephens volunteered for Heath by walking in a couple of parades and campaigning door-to-door. Kelley provided support through publishing an advertisement, hosting a fund raiser, and campaigning door-to-door.

Heath's opponent in the November 2010 general election was Larry Davis. Davis had been a Democrat for many years, but decided to run for Madison County Assessor on the Republican ticket when it became apparent that Heath would have no Republican challenger.

Davis campaigned on the promise that he would bring much needed improvement to the

Madison County Assessor's Office. He asserted that the office was dysfunctional, that property tax assessment bills were incorrectly calculated, untimely, and that the employees of the office were not producing a good work product. He espoused the need for "good government" and promised to "clean up" the assessor's office, taking it in a "different direction." He even stated during the campaign that he was going to remove every employee working in Heath's administration and start with a "brand new slate."

According to Kelley, Davis was aware that she was campaigning on behalf of Heath because she (Kelley) and Davis "crossed paths" several times during the campaign season at different parades and while knocking on doors in the same neighborhoods. According to Kelley, Davis also knew that she supported Heath because he was present at a Madison County Council meeting just weeks before the November 2010 general election at which she testified before that governing body praising Heath's management of Madison County Assessor's Office. According to Kelley, after she presented her testimony, Davis pulled her aside and expressed to her: (1) his disagreement that Heath was doing a good job as Madison County Assessor; and (2) his "hope" that Kelley's mother, who was influential in Madison County politics, was not campaigning against him. According to Kelley, Davis also told her that he knew her mother, who was influential in the Madison County Democrat party, was campaigning for the Democrat running for Madison County Treasurer and, thus, if Heath was not reelected, Kelley "would still have a job." [2]

According to Stephens, Davis must have known that she supported Heath because of an

---

[2]   Davis denies telling Kelley that if Heath lost the election, Kelley would be able to get a job in the Madison County Treasurer's Office because of her mother's political connections. For purposes of this summary judgment motion, however, we accept the facts in the light most favorable to Kelley and, as explained below, this disagreement does not, in any event, create a genuine issue of material fact precluding judgment in favor of Defendants.

email she received during the time of the campaign, when one of Davis's best friends and key supporters, Dorothy Manis[3], came to believe that Stephens was going around town "bad mouthing" Davis. Displeased with what she believed Stephens was saying, Manis sent Stephens what she described at her deposition to be a "wine-induced" email. The email was sent on October 28, 2010, just days before the general election warning Stephens that her support for Heath might come back to "haunt" her. Manis's email read,

> I think you have been in politics long enough to know not to talk about me supporting Larry [Davis], and you should understand why I am helping him. I have always treated you fair, and [C]heryl has never helped me one time. When I ran for Mayor she let Tom Broderick think for her. I don't expect you to vote for him nor do we want you to, but some of the crap that you are doing just might come back to haunt you. I am not there to protect you now. You remember when we were always out walking in the elections and going to democrat meetings where in the hell was [C]heryl and I am not the only one who thinks she has not paid her dues. You go ahead and kiss Cheryl's ass as you have since she took over the office and keep up the good work.[4]

Davis won the election, and in December 27, 2010, just five days before he was to take office, Davis sent letters to Kelley, Stephens and three other persons on Heath's staff informing them that he would not be retaining them in his administration when he took office. His letters to Kelley and Stephens were identically worded and read:

> January 1, 2011 is the first day of the newly elected administration for the Madison County Assessor's Office. Although I appreciate your service to the previous administration, I have determined

---

[3] Notably, it was Manis who first hired Stephens to work in the Anderson Township Assessor's Office in June of 1980 at which time Manis was serving as the duly elected (Democrat) Anderson Township Assessor. [Stephens Dep., p. 9, l. 24 - p. 12, l. 11.] Manis and Stephens had also been sisters-in-law before Stephens was divorced from Manis's brother. [Id.]

[4] Although Manis was a long-time Democrat, she was helping Davis campaign on the Republican ticket because she wanted to see Heath defeated.

4

> keeping you in your current position would not be conducive to our effort to institute a new direction for the office.
>
> Accordingly, you are notified that effective upon my assuming office on January 1, 2011, you will be relieved of your current duties with the Madison County Assessor's Office. Thanks again for your work and your commitment to public service. I wish you the very best in your future endeavors.

After receiving the letters, Kelley and Stephens went to the Madison County Attorney and to the Madison County Commissioners to see if any of those officials could help them preserve their jobs. Kelley and Stephens also filed grievances with the Madison County employees' union. Following a meeting with a union representatives, the Madison County Commissioners asked Davis to reinstate Kelley and Stephens, but Davis did not do so.

Davis replaced Kelley with Rosetta Cummings, a Republican. He did not hire a specific person to replace Stephens, but the parties agree that all of the new people Davis hired to work in his administration had supported his campaign. Although Davis had promised during his campaign that he was going to eliminate all of Heath's employees and start with a "clean slate," he ended up retaining on his staff eight of the persons who had formerly worked for Heath.

Less than two months after losing their jobs, Plaintiffs filed this action in the Madison Superior Court alleging that Davis terminated them from their jobs in retaliation for their support of Heath in the election. They seek money damages from him in both his individual capacity and official capacity as Madison County Assessor for violating their First Amendment rights to free speech and free association. [Complaint (Dkt. No. 1-3).] Davis removed the case to this Court. Later, Plaintiffs amended their complaint to add Madison County as a defendant. They allege that "Defendant Madison County is responsible for providing relief in connection with any judgment against Davis in his official capacity or, alternatively, in connection with a settlement of this matter

as to Defendant Davis in his official capacity." [Amended Complaint, ¶¶ 45 & 50 (Dkt. No. 22).]

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Chelates Corp. v. Citrate, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts and draws all reasonable inferences in a light most favorable to the non-moving party. See id. at 255.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enters. v. First Chi. Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Chelates, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove one essential element "necessarily renders all other facts immaterial." Chelates, 477 U.S. at 323.

## III.  DISCUSSION

The convoluted and contested facts running through this case are like a B-movie replete with nepotism in governmental hiring, feuding ex-sisters-in-law, old grudges, "wine-induced" emails, and shifting political allegiances and alliances. Although many facts are in dispute, the *material*

6

facts are not. All of the small town political drama aside, we find that, under Indiana law, political affiliation is an appropriate requirement for the position of an Indiana Deputy County Assessor. Thus, assuming without deciding that Davis decided not to retain Plaintiffs on his staff because they had supported his political opponent, Heath, Defendants are still entitled to summary judgment.

In Elrod v. Burns, 427 U.S. 347, 360 (1976), the United States Supreme Court held that patronage dismissals infringe First Amendment interests but that First Amendment rights can be limited or restrained for appropriate reasons. The Elrod Court noted that although political loyalty is important in a representative government, this goal did not justify "validat[ing] patronage wholesale." Id. at 367. The Court struck a balance and "[l]imit[ed] patronage dismissals to policymaking positions. Id. However, the Court struggled to define "policy making positions." It noted that "no clear line can be drawn between policymaking and non-policymaking positions." Id. The Court provided little guidance other than noting that policymaking positions were those with broadly defined responsibilities, stating that "consideration would also be given to whether the employee acts as an adviser or formulated plans for the implementation of broad goals." Id. at 368. Elrod now stands for the proposition that "party affiliation may be an acceptable requirement for some types of government employment. Branti v. Finkel, 445 U.S. 507, 517 (1980).

In the Seventh Circuit, the inquiry centers on whether the governmental position authorizes, either directly or indirectly, meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals or their implementation. Americano v. Carter, 74 F.3d 138, 141 (7th Cir. 1996). In answering that question, courts look to the powers inherent in the position rather than to the actual functions performed by the position's current occupant. Tomszak v. City of Chicago, 765 F.2d 633, 640 (7th Cir. 1985). Also informative is "the degree of discretion and responsibility exercised in the position." Allen v. Martin, 460 F.3d 939, 944 (7th Cir.

2006) (quoting Kiddy-Brown v. Blagojevich, 408 F.3d 346, 355 (7th Cir. 2005)).

Normally, unless there is reason to doubt its reliability, a job description will provide guidance to determine the powers inherent in the position at issue. Riley v. Blagojeveich, 425 F.3d 357, 358 (7th Cir. 2005). However, when the powers of the position are set by statute or ordinance, courts look to the statute or ordinance since any conflict between the statue or ordinance and the job description would need to be resolved in favor of the statute or ordinance." Davis v. Ockomon, 668 F.3d 473, 477 (7th Cir. 2012).

While the Plaintiffs' job descriptions as developed by Madison County have been placed in the record, the powers and duties of a deputy assessor are set forth in Indiana Code § 36-20-16-3, which provides:

(a)  A deputy appointed under this chapter *may perform all the official duties of the officer who appointed him* and is subject to the same regulations and penalties as the officer.

(B)  The officer appointing the deputy is responsible for all the official acts of the deputy.

(Emphasis added).

Because deputy county assessors are appointed by the county assessor, Ind. Code § 36-2-16-8(a), we must examine the duties of the county assessor. Indiana Code § 36-2-15-5 provides the duties of the county assessor. It states that the county assessor is to perform all functions assigned to him by statute including countywide equalization, the selection and maintenance of county-wide computer system, certification of gross assessments to the auditor, and the discovery of omitted property. Id. In addition, where the township assessor's office has been abolished, the county assessor is to perform the assessment duties previously assigned to the township assessor under Title 6, Article 1.1 of the Indiana Code. Id.

Title 6, Article 1.1 of the Indiana Code provides for the procedures pursuant to which all assessing officials shall assess the real and personal property that is subject to assessment and taxation in Indiana. That portion of the Indiana Code authorizes the assessing official to verify business personal property tax returns and to assess or estimate the value of personal business property when the taxpayer fails to file a return (i.e., Kelley's job). It provides for the assessment and reassessment of real property ( i.e., Stephens's job). It also provides for the review of assessed valuations for real and personal property, specifically giving assessing officials authority to resolve assessment and deduction issues with taxpayers who appeal their assessments.

Accordingly, the duties of deputy county assessors in Indiana to (1) effect the assessment of real and personal property using the discretion given to them, (2) resolve appeals, and (3) adjust erroneous assessments carries an inherent opportunity to provide meaningful input into governmental decisionmaking on issues where there is room for principled disagreement on goals and their implementation. Although Plaintiffs urge us to view the job of a deputy county assessor in Indiana as one in which only simple, ministerial tasks are performed, the job as it is defined in the Indiana Code it not a lowly, ministerial, discretionless one. The deputy county assessor plays a vital role in the implementation of the county assessor's policies.

We observe that in Kline v. Hughes, 131 F.3d 708 (7th Cir. 1997), the Seventh Circuit Court of Appeals considered the question of whether a deputy county *auditor* was a policymaking position exempt from the rule set forth in Branti. In that case, Seventh Circuit observed that, under Indiana law, deputy county auditors had the authority to perform all of the duties of the elected county auditor and that the elected county auditor was responsible for all of the acts of her deputies. Id. at 710. The Seventh Circuit then found that this statutory scheme placed the deputy county auditor in a position that carried with it the inherent ability to have meaningful input into governmental

9

decisionmaking on issues where there was room for principled disagreement on goals or their implementation. Id. at 705. The statutory scheme here is almost identical to the statutory scheme in Kline and we see no grounds to rule differently than the Seventh Circuit did in Kline.

## IV. CONCLUSION

Because we find that, under Indiana law, party affiliation and personal loyalty to the duly elected officer are appropriate requirements for the effective performance of the office of deputy county assessor, we find that neither Davis nor Defendant Madison County violated Plaintiffs' First Amendment rights in terminating their employment following Davis's election. We need not consider Davis's qualified immunity argument in light of this determination. Summary judgment is granted in favor of Defendants and against Plaintiffs. A separate judgment shall issue.

IT IS SO ORDERED.

Date:   09/30/2013

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Brandi A. Gibson
COOTS HENKE & WHEELER, P.C.
bgibson@chwlaw.com

Robert Adam Hicks
MACEY SWANSON & ALLMAN
rhicks@maceylaw.com

Matthew L. Hinkle
COOTS HENKE & WHEELER
mhinkle@chwlaw.com

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com